UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| STACY VERNIER, individually and as independent administrator of and on behalf of the ESTATE OF NATHAN LEE JOHNS and NATHAN LEE JOHNS' heir(s)-at-law and wrongful death beneficiaries, | § § § § § | |
| | § | CIVIL ACTION NO. |
| Plaintiff, | § | |
| | § | JURY DEMANDED |
| v. | § | |
| | § | |
| SMITH COUNTY, TEXAS; and TURN KEY HEALTH CLINICS, LLC, | § § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> **Pretrial detainee Nathan Lee Johns suffered and died an unnecessary and preventable death by suicide while incarcerated in the Smith County jail as a result of Defendants' policies, practices, and customs.**



Table of Contents

I.      Introductory Allegations .................................................................................3

        A.      Parties...............................................................................................3

        B.      Jurisdiction and Venue.......................................................................5

II.     Factual Allegations .......................................................................................5

        A.      Preliminary Statements .....................................................................5

        B.      Nathan's Suffering and Death in the Smith County Jail.....................6

                1.      Introduction...........................................................................6

                2.      General Allegations ..............................................................7

                3.      Texas Rangers Investigation ...............................................18

                4.      Texas Commission on Jail Standards Investigation............22

                5.      Autopsy Report ...................................................................26

        C.      Liability of Smith County and Turn Key Health .............................26

                1.      Introduction.........................................................................26

                2.      Turn Key Health's Agreement and Partnership with Smith County ...27

                3.      Nondelegable Duties and Respondeat Superior...................32

                4.      Defendants' Policies, Practices, and Customs ....................35

                5.      Study of Smith County Jails Confirms Systemic Issues.....40

                6.      TCJS Records Showing County Policies, Practices and Customs.......44

                7.      Suffering and Death of Other Detainees ............................51

III.    Causes of Action ........................................................................................56

        A.      Remedies for Violation of Constitutional Rights.............................56

        B.      Cause of Action Against Smith County and Turn Key Health Under 42
                U.S.C. § 1983 for Violation of Constitutional Rights ....................57

        C.      Cause of Action Against Turn Key Health for Negligence/Malpractice .........60

IV.     Concluding Allegations and Prayer .............................................................60

        A.      Conditions Precedent ........................................................................60

        B.      Use of Documents at Trial or Pretrial Proceedings .........................61

        C.      Jury Demand ....................................................................................61

        D.      Prayer ...............................................................................................61

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Stacy Vernier ("Ms. Vernier") sues as the independent administrator of the Estate of Nathan Lee Johns, Deceased. Nathan Lee Johns may be referred to herein at times as "Nathan," "Mr. Johns," or the "decedent," depending on the context. Ms. Vernier, when asserting claims in this lawsuit as the independent administrator, does so in that capacity on behalf of all wrongful death beneficiaries including herself (Nathan's mother) and Thomas Johns (Nathan's father) (collectively "Wrongful Death Beneficiaries"). Ms. Vernier seeks all wrongful death and other damages available under law to the Wrongful Death Beneficiaries. She also sues in that capacity asserting claims on behalf of the estate and all of Mr. Johns' heirs including herself and Thomas Johns (collectively "Claimant Heirs"). Ms. Vernier seeks all survival and other damages available under law to the Claimant Heirs. Ms. Vernier qualified as independent administrator in Cause Number 056-2024CCL2, in the County Court at Law No. 2 of Henderson County, Texas, in a case styled *In the Estate of Nathan Lee Johns, Deceased.*

2.      Defendant Smith County, Texas ("Smith County" or "the County") is a Texas county.  Smith County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Neal Franklin, at 200 E. Ferguson, Suite 100, Tyler, Texas 75702, or wherever Honorable County Judge Neal Franklin may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a). The County acted or failed to act at all relevant times through Turn Key Health Clinics, LLC and County employees, agents, representatives,

jailers, and/or chief policymakers, all of whom acted under color of state law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983). The County's and/or Turn Key Health Clinics, LLC's policies, practices, and/or customs were moving forces behind, caused, were proximate causes of, and were producing causes of constitutional violations and damages (including death) referenced in this pleading.

3.      Defendant Turn Key Health Clinics, LLC (sometimes referred to herein as "Turn Key Health") is an Oklahoma limited liability company. Turn Key Health may be served with process by serving its registered agent for service of process, Incorp Services, Inc., at its registered office, 815 Brazos Street Suite 500, Austin, Texas 78701. Such service is in accordance with Federal of Civil Procedure 4(h)(1)(A), which provides that service of process may be made in the manner prescribed by Rule 4(e)(1) for serving an individual. Rule 4(e)(1) provides that service on an individual may be made in the manner allowed by the law of the state in which the district court in which the federal case is filed is located. Service on the registered agent for service of process is provided by Texas law. In addition, Turn Key Health may be served with process, pursuant to Rule (4)(h)(B), by delivering a copy of the summons and this complaint to an officer, or a managing or general agent, of Turn Key Health, wherever any such person may be found. Thus, Turn Key Health may also be served with process by serving its director, Jesse White, or its CFO, Meridith Warren, at 900 NW 12th St., Oklahoma City, Oklahoma 73106, or wherever such persons may be found. Turn Key Health acted and/or failed to act at all relevant times through its employees, agents, representatives, and/or chief policymakers and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to vicarious liability law and law applicable to claims pursuant to 42 U.S.C. § 1983). Turn Key

Health acted at all times under color of state law, and its policies, practices, and/or customs were moving forces behind and caused constitutional violations and resulting damages (including death) referenced in this pleading.

### B.    Jurisdiction and Venue

4.    The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4) because this suit presents a federal question and seeks relief pursuant to federal statute(s) providing for the protection of civil rights. This suit arises under the United States Constitution and 42 U.S.C. § 1983. The court also has supplemental jurisdiction over all other claims in this case, pursuant to 28 U.S.C. § 1367(a), because all such other claims are so related to claims in this case within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. The court has personal jurisdiction over the County because it is a Texas county. The court has personal jurisdiction over Turn Key Health because, including but not limited to, Turn Key Health's minimum contacts with Texas are such that Turn Key Health would expect to be subject to the court's jurisdiction. Venue is proper in the Tyler Division of the United States District Court for the Eastern District of Texas pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Smith County, which is in the Tyler Division of the United States District Court for the Eastern District of Texas.

## II.    Factual Allegations

### A.    Preliminary Statements

5.    Plaintiff provides in factual allegations sections below the general substance of certain factual allegations. Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations. Rather, Plaintiff intends that those

sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claims have facial plausibility. Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading, in accordance with Federal Rule of Civil Procedure 11(b)(3), that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. Moreover, where Plaintiff quotes a document, conversation, or recording verbatim, or provide a person's name, Plaintiff has done her best to do so accurately and without any typographical errors. However, some typographical errors may still exist.

6.      Plaintiff pleads facts which give rise to, and thus assert, conditions of confinement claims. Conditions of confinement claims require no deliberate indifference on behalf of a governmental or private entity or governmental or private actor. In the alternative, Plaintiff pleads facts which give rise to episodic acts and/or omissions claims. Regardless, pursuant to United States Supreme Court authority, Plaintiff need not assert in this pleading specific constitutional claims but rather must merely plead facts which give rise to constitutional claims. Plaintiff thus asks the court to apply the correct legal theories to the facts pled. Plaintiff is not pleading her "best case" and will only be able to do so after conducting discovery. Plaintiff does not intend to "stand" on this pleading but will seek leave to amend as further facts are developed, or in the event any court determines that Plaintiff's live pleading is any manner deficient.

B.      Nathan's Suffering and Death in the Smith County Jail

1.      Introduction

7.      Nathan had a significant history of mental health issues and self-harm tendencies. He was a patient for roughly a week in a mental health unit of a Tyler hospital immediately preceding the arrest that landed him in the Smith County jail. While Nathan was receiving treatment, a police officer learned of an outstanding warrant for an alleged crime for which Nathan

had not been convicted. Officers went to the hospital, witnessed Nathan biting himself, and then witnessed Nathan attempting to die by suicide through use of a ligature. Nathan was arrested and transported to the Smith County jail with a stapled-shut bag of medications and instructions for other medications that needed to be picked up and administered.

8.      The Smith County jail used a portable phone for detainee phone calls, which upon information and belief could be moved down a hallway outside of cells and plugged into a wall when needed. The phone was left outside of Nathan's cell, without supervision. Nathan was able to easily pull the phone's lengthy electrical or data cord into his cell and use it as a ligature, tying it off to a fixture in the ceiling above an elevated bed and stool. Nathan died by suicide in the Smith County jail through use of that cord, and a tie-off point in the cell, even though cords are well-known in the corrections community as being used by detainees to die by suicide. When Nathan's family picked up his belongings after his death, the bag containing medications was still stapled shut. Nathan was also not administered other needed mental health medications, at all, while he was in the Smith County jail. Nathan died by suicide, while on suicide watch, through use of a jail-supplied ready ligature, and without and as a result of not being administered needed mental health medications.

### 2.      General Allegations

9.      On January 30, 2023, two officers were called to the fourth floor East Behavioral Health Unit at UT Hospital in Tyler. While officers were speaking with medical staff, they learned that Nathan believed that there were bugs and parasites coming out of his skin. Everyone realized this was Nathan's psychosis, and he was imagining things.

10.      On February 1, 2023, University of Texas System police officers attempted to serve an outstanding warrant on Nathan at the mental health unit at UT hospital in Tyler. Nathan made numerous suicidal statements and bit his arm in the presence of the officers and others. As

opposed to being arrested, Nathan was allowed back into the secured portion of the mental health floor. Nathan climbed into the ceiling and attempted to die by suicide by hanging himself, by jumping down from the ceiling with a shirt tied around his neck. Police officers had to cut the shirt from Nathan's neck as his face and lips turned blue. Nathan was then treated in a hospital emergency department and transported to the Smith County jail. Upon information and belief, material information regarding these occurrences was provided to people working at the Smith County jail when and after Nathan was booked-in. Moreover, such information was likely communicated between jailers and medical personnel working at the jail during Nathan's incarceration.

11.     When Nathan was discharged from the hospital due to arrest, the After Visit Summary document, comprised of ten pages, was upon information and belief provided to arresting officers. Further, upon information and belief, that document was also provided to Defendants after Nathan was transported to the Smith County jail. The After Visit Summary indicated that Nathan had been an inpatient at the University of Texas Health North psychiatric unit from January 25, 2023 until February 1, 2023. It also provided, as Nathan's primary discharge diagnosis, "psychosis, unspecified psychosis type (HCC)." The document referenced suicide prevention resources.

12.     The "next steps" in the document indicated that medications needed to be picked up for Nathan, specifically (1) hydroxyzine (commonly known as Atarax), (2) oxcarbazepine (commonly known as Trileptal), (3) risperidone (commonly known as Risperdal), and (4) buprenorphine (commonly known as Subutex). The first three listed medications were to be picked up at the hospital from which Nathan was discharged. The last of the four medications was to be picked up from a pharmacy with the printed prescription that was, upon information and

belief, provided to the arresting officers and further provided by the arresting officers to Defendants at the Smith County jail. A stapled-shut bag of medications, containing oxcarbazepine and risperidone, was taken by the arresting officer(s) to the Smith County jail. Hydroxyzine, which has sedative properties and is used for symptomatic relief of tension and anxiety associated with psychoneurosis, thus needed to be picked up by Defendants from the hospital to administer to Nathan while he was in the jail. Upon information and belief, it was neither picked up nor administered.

13.     Oxcarbazepine, which can be used alone or in combination with other medications to control certain types of seizures, working by decreasing abnormal electrical activity in the brain, thus needed to be picked up by Defendants from the hospital to administer to Nathan while he was in the jail. Upon information and belief, it was neither picked up nor administered.

14.     Risperidone, an anti-psychotic medication used to treat mental health conditions including bipolar disorder and schizophrenia, and also psychotic symptoms when they are present in cases that involve borderline personality disorder, delusional disorder, delirium, depression, brain injury, bipolar disorder, and/or PTSD, thus needed to be picked up by Defendants from the hospital to administer to Nathan while he was in the jail. Upon information and belief, it was neither picked up nor administered.

15.     Buprenorphine, used to treat dependence on narcotic drugs, such as morphine and heroin, thus needed to be picked up by Defendants from the pharmacy to administer to Nathan while he was in the jail. Upon information and belief, it was neither picked up nor administered. Upon information and belief, the failure to secure and administer these four medications to Nathan resulted in and was a moving force behind Nathan's suffering and death.

16.     Nathan was booked into the Smith County jail at approximately 4:37 p.m. on February 1, 2023 for charges for which he had not been convicted and which were not even filed. The Screening Form for Suicide and Medical/Mental Developmental Impairments, promulgated by the Texas Commission on Jail Standards ("TCJS") and required to be completed for all county jail detainees, indicated several things regarding Nathan. These included that he had been hospitalized at UT North hospital in the mental health unit before booking, was taking medications, was very uncooperative, and was "drugged" by the hospital and thus unable to answer questions. Arresting officer(s) surely told people working in the jail about Nathan's suicide attempt at the hospital. The Continuity of Care Query ("CCQ") came back as a "probable" match. A CCQ is a search to determine whether a person has received state mental health services and thus needs referral to an appropriate mental health agency. Nathan, actively suicidal before being sedated by the hospital, was still actively suicidal and therefore was locked into a padded cell and placed on suicide watch. At approximately 12:27 a.m. on February 2, 2023, Nathan had a seizure. Nathan was not transported to a hospital as a result of that seizure.

17.     On February 4, 2023, at approximately 1:16 a.m., Nathan was sent to a hospital for altered mental status. He was then returned to the jail.

18.     The jail did not complete a medical intake for Nathan until three days after he was initially incarcerated. The TCJS faulted people working at the jail for failing to do so, as referenced below in this pleading. Regardless, on February 4, 2023, at approximately 5:07 p.m., a medical intake for Nathan was finally completed. Upon information and belief, all or substantially all medical personnel referred to in this complaint were employees of Turn Key Health acting in the course and scope of their duties at all relevant times. During the seriously late medical intake, personnel determined that Nathan was taking medications, was anxious and

nervous, had wounds to his left arm, and had been taking opioids. Nathan was still on suicide watch, and those working in the jail knew that Nathan had attempted to hang himself at the hospital before arrest and likewise bit his arm while at the hospital. There was no doubt to anyone at the jail familiar with Nathan that Nathan was actively suicidal.

19.     Nathan said that he sometimes heard voices and noises that other people could not hear, and which were thus nonexistent, and that he had been treated for emotional and mental health issues while previously incarcerated. He also said that he had been hospitalized for mental health issues from January 25, 2023 until his arrest on February 1, 2023. Nathan also said that he suffered from nightmares and flashbacks, believed that someone could control his thoughts and/or mind, and suffered from a learning disability and was in special education in school.

20.     The only medications listed to be administered to Nathan during incarceration were ondansetron, for nausea and vomiting, clonidine, but only on request, and azithromycin, an antibiotic. Nathan was in no condition, in his psychotic state, to know which medications to request and when to request them. This was due in part to Defendants' failure to secure and administer needed medications referenced above.

21.     On February 6, 2023, at approximately 1:01 a.m., during mental health rounds, personnel noted Nathan's odd behavior. This was not an isolated instance. Such behavior was consistent, and there was little doubt that Nathan would hurt himself if given the means and the opportunity. Nathan said that he was not sure if he was hallucinating, or if it was a microorganism in his ear that was causing him to hear things. Nathan was visibly psychotic.

22.     On February 9, 2023, at approximately 12:23 p.m., a jail-supplied portable phone with a very long cord was allowed to remain just outside of Nathan's cell. This was consistent with policy, practice, and/or custom in the jail, as Smith County had chosen not to remedy use of

a phone with a long cord in a portion of the jail in which people needed active monitoring. Smith County could have chosen to use widely-available phones mounted in each cell, and which had no cords at all. In fact, certain for-profit correctional telephone providers have been known to install such phones without charge due to profits secured by such providers when detainees use telephone services.

23.     The door to Nathan's cell was metal, with a small viewing port at roughly eye-level,  and with a food chute roughly two to three feet below that. A food chute is a slot in a cell door, with a flap that can be closed, which allows the passage of a food tray into the cell. The food chute to Nathan's cell was open.



24.     At approximately 12:27 p.m., lunch was distributed. Approximately six minutes later, Nathan reached out of the food chute and did something to the cell door lock. Approximately seven minutes later, at 12:40 p.m., a jailer observation round occurred.

25.    The phone, with a lengthy cord, was allowed to remain in the current position, pursuant to Smith County policy, practice, and custom. Approximately two minutes later, at 12:42 p.m., Nathan pulled the portable phone cord into his cell through the food chute. Nathan then closed the food chute. This would have been visible to anyone in the hallway and upon information and belief anyone watching cell video feed. Roughly eleven minutes later, at 12:53 p.m., Nathan was found, having died by suicide through use of the jail-supplied cord, by tying one portion of the cord to a known tie-off point in the cell and another portion of the cord around his neck.





The known tie-off point was just above a stool and the bed, thus allowing easy access to and the ability for a person to stand on the stool and/or bed to facilitate death through use of a ligature.



26.     Justice of the Peace Jon W. Johnson conducted an inquest. He learned in part that jail records showed that Nathan had attempted suicide before, and that there was an urgent mental health referral in the jail for Nathan. He also found that records indicated that suicide precautions needed to be taken for Nathan in the Smith County jail. Judge Johnson came to the understanding that a "code blue" was called by a jailer inside cell block number 309, at 12:53 p.m. on the day that Nathan was found, and that Nathan was seen hanging from a ceiling fixture by an orange electrical cord. He also understood that a medical team in the jail arrived at 12:55 a.m. and saw, through the window in the cell door, Nathan hanging. He further learned that Nathan had apparently put materials into the keyhole of the door lock to make the door difficult to open.

27.     It was further Judge Johnson's understanding that jail staff, including the custodian, eventually used a cutting torch to assist in opening the door, the door not being opened until 1:14 p.m. Thus, approximately twenty-one (21) minutes passed from the time Nathan was discovered until the door was opened. A person can die or suffer permanent brain damage from a lack of oxygen in such a situation in as little as three to five minutes or less. There was therefore no hope for Nathan being resuscitated at that time, and EMS personnel determined at 1:16 p.m. that Nathan was deceased. Judge Johnson listed as a suspected cause of death "asphyxiation by hanging," and the manner of death as "suicide."

28.     Various Smith County Sheriff's Office employees provided incident reports and/or statements related to Nathan's death. None of them mentioned anything regarding the phone and/or cord being used improperly and/or inconsistent with policy, practice, and/or custom in the jail. Sergeant Ronald Young indicated that, on February 9, 2023, at approximately 12:53 p.m., he and Sergeant N. Rios were on the second floor of the Smith County jail. They both heard someone on the radio calling for a "code blue" inside cell 309, and that the detainee in the cell was hanging.

They both went to the cell and saw Sergeant Amador, Jailer Boller, and Jailer Murphy. Deputy Young saw an orange cord wrapped around what the jail referred to as a side cell phone. It was wrapped around the phone and the cell door handle. The phone was a rolling phone.

29.     Deputy Young looked through the cell door window and saw Nathan, hanging from the smoke detector with the orange cord wrapped around his neck. Deputy Young cut the cord that was wrapped around the phone and the door handle to try to open the cell door. However, after inserting a key into the door lock, he learned that the key would go only roughly halfway into the lock. He and Sergeant Amador attempted to open the door but were unable to do so. Sergeant Amador said that there was a piece of the armband stuck in the lock preventing the key from working. He further indicated that, at approximately 12:55 p.m., medical staff arrived at the outside of the cell.

30.     Deputy Young, Sergeant Rios, and Sergeant Amador attempted to get the shredded plastic out of the lock with a paperclip but were unable to do so. Deputy Young then told Officer Giles to get maintenance personnel to come with a blow torch as soon as possible. Jailers and officers attempted other things to open the cell door but were unsuccessful. Deputy Young indicated that emergency medical services and fire department personnel arrived at approximately 1:05 p.m. they then waited to provide medical care until the cell was opened. Maintenance worker M. Willard arrived at the cell at approximately 1:09 p.m., with a torch and angle grinder. He attempted to use the angle grinder without success. Then he used the blow torch, and the cell was opened at approximately 1:14 p.m. Sergeant Rios, Officer Boller, Officer Perkins, and Deputy Young entered the cell. Sergeant Rios, Officer Perkins, and Deputy Young held Nathan up while Officer Boller cut the cord being used as a noose. Nathan was put onto the floor, so that EMS could attempt to resuscitate him. Deputy Young indicated that Nathan had no sign of life.

Therefore, Nathan's body was taken, at approximately 1:16 p.m., to the jail clinic until the justice of the peace would arrive. A justice of the peace arrived, over two hours later, at approximately 3:20 p.m., and declared Nathan as being deceased.

31.     Sergeant Jonathan Amador indicated that he was one of the supervisors on duty at the time that Nathan was found, deceased. When he arrived at Nathan's cell, he saw that the side cell rolling phone was against the door of Nathan's cell, and he heard jailers saying that they could not enter the cell because the key would not work. He saw a blue-colored item in the locking cylinder of the cell. When he removed it, he saw that it was a piece of an armband. He also saw Sergeant Young cut the main power cord of the rolling phone, which was the cord Nathan used to die by suicide.

32.     Sergeant Nelson Rios indicated that he was an acting supervisor for the Smith County jail from 7:00 a.m. to 7:00 p.m. on February 9, 2023. He, like others, arrived at Nathan's cell when learning of Nathan's suicide. He saw that the extension power cord used for the mobile phone appeared to be tied somewhere inside of Nathan's cell directly in front of the doorway. It appeared to Sergeant Rios that the placement of the mobile phone right in front of the cell door, and the manner in which the cord was tied, was done by Nathan to prevent entry to the cell. He saw Sergeant Young cut the extension cord, thus enabling pulling the phone away from the doorway. There appears to be a fact dispute among witnesses as to whether the cord was an electrical cord or a data cord. This dispute will ultimately be immaterial, because the cord was visibly strong enough to be used in the manner in which Nathan used it.

33.     Jailer D. Adams was assigned to the third floor of the Smith County jail on February 9, 2023. Jailers, J. Khasoha and B. Murphy were conducting checks of the side cells. Jailer M. Perkins was feeding detainees. Jailer Khasoha came upon side cell 309, and Jailer

Adams heard a scream. Jailer Adams then saw Jailer Perkins and Jailer Murphy run to the cell in which Nathan had died by suicide. Jailer Perkins immediately called a "code blue."

### 3.    Texas Rangers Investigation

34.    The Texas Rangers investigated Nathan's death. The purpose of a Texas Rangers custodial death investigation is to determine whether there was any criminal liability for what occurred. Texas Rangers do not determine whether there is civil liability for violation of a person's constitutional rights, such as that alleged in this case. Therefore, the Texas Rangers' determination as to whether to recommend prosecution does not determine whether Defendants are civilly liable for Nathan's death.

35.    Ranger Stephen Baggett, with the Texas Department of Public Safety, conducted the investigation. Ranger Baggett learned, in summary, that Nathan was in a separation cell on suicide watch in the Smith County jail, disabled the key lock to the cell by jamming the keyhole, detached and pulled into his cell the cord from the phone outside of his cell, tied the cell door shut, and hung himself with the cord. When viewing the cell, side cell 309, he saw that the cell door was blue and numbered in large black numbers at the top. He saw a small observation window in the middle of the cell door at roughly eye-level, and also a feeding slot lower in the middle of the door. The feeding slot was large enough to allow entry of a food tray. He also saw burn marks on the door near the keyhole. Ranger Baggett also saw, taped to the wall outside the door, a Turn Key Health mental health observation/suicide watch form. The form noted only two observations, February 8, 2023 and February 9, 2023. The Ranger noted that the form was separate from jail suicide watch checks.

36.    Ranger Baggett saw inside the cell what he perceived as a long orange data-type cable hanging from a metal cover bolted to the ceiling. He also saw another piece of the orange data cable wrapped around the leg of the bed. Nathan's body was in the jail infirmary on a bed

with a suicide smock covering him, and Nathan had AED pads on his chest. He also saw furrowing/bruising on Nathan's neck, consistent with hanging. Ranger Baggett noted that the cell check log for February 8, 2023 and February 9, 2023 contained an entry for February 9, 2023 at 1:06 p.m. which read "suicide watch."

37.     Ranger Baggett learned that Nathan had been arrested on February 1, 2023 at 1:00 p.m. by University of Texas at Tyler Police. The evading arrest charge was based on a warrant, while the other two charges were based on Nathan's suicide attempt at the hospital. Nathan had climbed above the drop ceiling and attempted to die through use of a ligature. Ranger Baggett saw that the probable cause affidavit for Nathan's arrest at the behavioral health floor at UT North indicated that Nathan threatened suicide and said that police officers would have to shoot him in the face. A probable cause affidavit is required by Texas jails to be completed by the arresting officer and must be submitted before a jail accepts an arrestee for incarceration. Thus, people working at the Smith County jail were aware of what occurred before Nathan's arrest.

38.     Ranger Baggett saw an email to Turn Key Health regarding Nathan. The email to Turn Key Health Clinics was dated February 1, 2023, at 5:23 p.m. It was sent to Phyllis Duke, Sandra Brazil-Hamilton, stave@turnkeyhealthclinics.com, smithmedical@turnkeyhealthclinics. com, Victoria Johnson, Tabitha Freeman, Rebecca Alexander, and Jason Cofer. Hope Woods was the sender. Ranger Baggett also learned that the only three medications which were administered in the jail (ondansetron, clonidine, and azithromycin) were not even started until several days after Nathan's incarceration in the Smith County jail.

39.     Ranger Baggett also apparently was able to review a number of records for Nathan in the CorEMR software system used by Turn Key Health. It was clear from those records that Turn Key Health, like Smith County, was charged with responsibility for Nathan's mental health

treatment and protection from self-harm. Records indicated that suicide precautions needed to be taken regarding Nathan, and that an urgent mental health referral, as of February 4, 2023, was necessary. Notes also indicated that Nathan had been a victim of sexual abuse, and that his criminal history was exclusively nonviolent. Notes also indicated that Nathan had made a suicide attempt apparently a couple of hours or so before being incarcerated in the jail. Records also indicated that Nathan was detoxing from opioids.

40.    A February 8, 2023, 3:30 p.m. note indicated in part that Nathan was squatting on the floor when the mental health professional arrived. The floor of his cell was covered in water, and Nathan was wet. He said that he was in and out of the shower so that he could stay warm. He also said that his suicide smock was wet and that no one would give him a towel. He said he had been talking to himself all day, and he needed to get out of the cell and be around people and watch TV. He said that he had a mental health treatment history for depression and similar issues. He also said he had a history of being treated for schizoaffective disorder. He said he hears a lot of voices (which were nonexistent) if he does not sing. Nathan continued to demonstrate his serious mental health issues. One note, dated February 8, 2023, the day before Nathan died, at 3:31 p.m., indicated that Nathan was requesting medication for "schizoaffective disorder." He said that he was hearing voices and had a history of depression. It appears that no one provided the needed and requested medication.

41.    Ranger Baggett returned a voicemail message left by Nathan's brother, Joshua Congleton. Joshua told the Ranger that, when Nathan was arrested at the hospital, medication from the hospital was transported by arresting officers to the Smith County jail. After Nathan's death, when the family picked up Nathan's property from the jail, the medication was still in the paper bag, stapled shut. The bag contained risperidone and oxcarbazepine.  Joshua also said that

his and Nathan's mother was in contact with Nathan early in Nathan's Smith County jail incarceration. Joshua understood that Nathan was urinating and/or defecating on himself and had not showered in about a week. He also understood that their mother begged people at the Smith County jail to provide to Nathan his needed medications, and that she had said something like, in substance, "He needs his meds; he's cracking; he needs his medication right now."

42.     Joshua also understood that their mother called several times, but jail personnel refused to provide to Nathan needed medications. Joshua expressed his frustration with the unfathomable events leading to Nathan's suicide: Nathan was put on suicide watch when he should have been in a mental hospital, had his needed medication denied, was locked into a room all day for about a week, with no clothes and no showers, and then was supplied with, in Joshua's understanding, a cord that was 12 to 14 feet long. Joshua's understanding regarding the length of the cord was not even close. While Plaintiff is not certain, as there inexplicably appears to have been no measurement of the cord's length referenced in documents obtained pre-suit, based upon photographs in this complaint, the cord could have been 30 to 50 feet long, or even longer.



43.     Joshua summarized obvious constitutional violations from his layperson's perspective, "It's unfathomable. It's like, oh, you want to kill yourself? Okay, well we're going to put you in this cell, deny your medication, and by the time you crack we're going to bring you this 14-foot cable." He further expressed his frustration that, according to what a jail captain told his father, that it took seventeen minutes to open the door after Nathan was discovered having hung himself. He was of course wrong regarding the time period that passed after Nathan was discovered and before anyone entered the cell. It took approximately twenty-one (21) minutes.

44.     Joshua also expressed his understanding of one or more additional conversations between his mother and people working at the Smith County jail. Such people could have been either Smith County employees or Turn Key Health employees. In his understanding, his mother said, "He needs his meds; he's cracking." He understood that his mother was told in response that people that worked at the jail could not administer the medications without a doctor approving such administration. Joshua understood that his mother responded in substance, "It's a doctor's prescription. It was filled when he left the hospital." Nevertheless, Joshua understood that his mother was told, "I'm sorry, ma'am, we can't do that. We can't administer."

### 4.     Texas Commission on Jail Standards Investigation

45.     The TCJS conducted an investigation of Nathan's death. The TCJS conducts investigations of custodial deaths in Texas county jails, and it is the state agency charged with enforcing minimum jail standards. However, despite Public Information Act requests, at the time this complaint was finalized, Plaintiff was unable to obtain from the TCJS complete documents or evidence related to that investigation. Plaintiff's counsel understands that Smith County objected to Plaintiff's ability to obtain from the TCJS complete evidence pursuant to the Public Information Act. Plaintiff will need to conduct discovery to obtain such evidence and expects to be able thereafter to plead additional facts.

46.     Smith County filed an Inmate Death Reporting Form with the TCJS. Lieutenant John Shoemaker was listed as the reporting officer. The report indicated that Nathan had died in a separation cell (side cell), and that the last face-to-face contact with Nathan was at 12:39 p.m. on February 9, 2023. Jailers Khasoh and Murphy were listed as the jailers that had the last known contact with Nathan. Jailer Khasoh was listed as the person who found Nathan, deceased, Nathan having died by suicide. The report admitted that Nathan was on suicide watch at the time of his death. Ranger Chris Baggett was listed on the form as the name of the investigating officer. It was thus unclear as to whether Smith County chose to conduct its own investigation or instead merely rely on a criminal investigation into Nathan's death.

47.     Even though Plaintiff was unable to obtain complete evidence and records from the TCJS, Plaintiff learned that the TCJS, when investigating Nathan's death, found issues with Smith County jail operations. The TCJS noted two areas of concern. First, the TCJS noted that Nathan had been in custody at the Smith County jail for three days before the intake health screening was conducted. TCJS instructed Sheriff Larry Smith, Smith County Sheriff Chief Gary Pinkerton, and the Smith County jail administrator that, when a detainee is uncooperative or otherwise refuses to answer medical intake questions, daily attempts must be made. Each daily attempt must be documented and kept in the detainee's medical file.

48.     Further, the TCJS pointed to the obvious problems with the phone and cord. The TCJS noted during an on-site inspection at the Smith County jail for March 21-23, 2023 that Smith County jail administration had to explore solutions to eliminate a long extension cord on a rolling portable phone. This was nothing new. Phone cords in jails were a known suicide risk for many years before Nathan's death by suicide.

49.     Defendants knew that detainees frequently commit suicide through hanging and/or asphyxiation, using items in their cells to form ligatures.  Jail suicides, as Defendants knew before the decedent's incarceration, are a huge problem in the United States.  According to Bureau of Justice statistics, suicides were the leading cause of jail deaths between 2000 and 2019, totaling 6,217 across the United States. This constituted 30% of all deaths in local jails. Further, in 2019, the suicide rate in jails was over two times that of the general public. People in county jails are five times more likely than the general population to have serious mental illness, and two-thirds of such persons have a substance abuse disorder.  Many people experience serious medical and mental health crises after they are booked into a jail, including psychological distress and shock of confinement.  Defendants also knew that most jail suicides occur by hanging/strangulation, with detainees using objects available to them as ligatures, in the first few hours or days after the beginning of incarceration. Detainees commonly use as ligatures bed linens, clothing, cords, and trash bags. Defendants also knew that a person could die or suffer irreversible brain injury within three to five minutes, or less, after application of a ligature. Thus, providing ready ligatures to people at material risk of suicide, without constant monitoring, is a recipe for disaster. This, when combined with failing to provide needed mental health medications, results in near certainty of serious injury or death.

50.     On or about July 9, 2015, the TCJS emailed to every Texas sheriff and every Texas county jail administrator, including the Smith County sheriff and Smith County jail administrator, a technical assistance memorandum regarding a number of recent jail suicides completed through use of phone cords. Upon information and belief, the TCJS likewise posted that memorandum on its website for a period of time long enough for every competent sheriff and jail administrator in Texas to review it. Upon information and belief, it has long been the practice of the Smith County

sheriff and/or Smith County jail administrator to periodically review the TCJS website for new postings regarding Texas jails. Thus, every Texas county was charged with actual and constructive knowledge of the technical assistance memorandum.

# TEXAS COMMISSION ON JAIL STANDARDS

**EXECUTIVE DIRECTOR**
Brandon S. Wood



P.O. Box 12985
Austin, Texas 78711
Voice: (512) 463-5505
Fax: (512) 463-3185
http://www.tcjs.state.tx.us
info@tcjs.state.tx.us

## TECHNICAL ASSISTANCE MEMORANDUM

**To:**      **All Sheriffs and Jail Administrators**
**From:**   **Brandon Wood, Executive Director**
**Date:**   **July 9, 2015**
**Reference:**   **Length of Phone Cords in Holding and Detoxification Cells**

Since September of 2014, four (4) suicide hanging deaths involving the use of telephone cords have occurred in Texas jails. These incidents have demonstrated that changes must be made if a jail chooses to place a telephone within a cell. A number of solutions have been suggested, including shortening cords or replacing standard telephones with a cord-free or hands-free type phones. A cord-free or hands-free type inmate phone that has a recessed, cordless handle is available, functioning similarly to a speaker-phone, but with the privacy of a telephone.

In each case, the telephone was located within the holding/detoxification cell, allowing the prisoners unhindered access at any time. Because of these incidents, two of the jails shortened their receiver cords to a total length of 12-16 inches. The telephones were otherwise unaltered, and are still in the same locations. The third jail replaced all phones in the holding, detoxification and separation cells with a cordless, hands-free phone.  The fourth jail is planning to replace their phones in holding and detox with a hands-free telephone. These four incidents highlight the need to provide telephones that, if placed within holding cells or other jail cells, do not provide a possible means of suicide.

While there is no minimum jail standard that mandates the length of the telephone cords in Texas county jails, it is the recommendation of this agency that **ALL** phone cords be no more than twelve (12) inches in length.  While we cannot prevent every suicide that occurs, it is incumbent upon this agency to share these events with our stakeholders in order to try and prevent future suicide attempts to preserve lives.

**Note:  In a Texas jail in 2002, a female inmate successfully committed suicide by hanging herself with a phone cord that measured 15 and ¾ inches in length.  The photo evidence of this hanging can be viewed by clicking on the following link: http://www.hawaii.edu/hivandaids/Suicidal_Hangings_in_Jail_Using_Telephone_Cords.pdf

Stanley D. Egger, Abilene, Vice Chair          Sheriff Dennis D. Wilson, Groesbeck          Dr. Michael M. Seale, M.D., Houston
Irene A. Armendariz, Austin          Sheriff Gary Painter, Midland          Larry S. May, Sweetwater
Jerry W. Lowry, New Caney          Allan D. Cain, Carthage
"The Commission on Jail Standards welcomes all suggestions and will promptly respond to all complaints directed against the agency or any facilities under its purview".
*To empower local government to provide safe, secure and suitable local jail facilities through proper rules and procedures while promoting innovative programs and ideas*

After Smith County received that technical assistance memorandum, it was put on notice that it needed to assure that any phone cords in cells or otherwise available to detainees had to be so short that it was impossible for them to be used as ligatures.  In the alternative, Smith County could simply use cord-free or hands-free phones.  Smith County chose to do neither.  It thus knew that its decision to do nothing regarding this problem would certainly lead to serious injury or death, especially when taken together with other policies, practices, and/or customs mentioned in this pleading.

### 5. Autopsy Report

51.     Miguel A. Laboy, MD., a forensic pathologist with Forensic Medical of Texas in Tyler, performed an autopsy of Nathan. Dr. Laboy indicated that the cause of Nathan's death was hanging, and the manner of death was suicide.

### C. Liability of Smith County and Turn Key Health

### 1. Introduction

52.     Plaintiff sets forth in this section additional facts and allegations supporting liability claims against the County and Turn Key Health pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978) and/or other applicable law. It is Plaintiff's intent to show that all facts asserted in this pleading relating to policies, practices, and customs of the County and Turn Key Health support such liability claims, and not just facts and allegations set forth in this section. Such policies, practices, and customs alleged in this pleading, individually or working together, and whether supporting conditions of confinement or episodic acts and omission claims, were moving forces behind and caused the constitutional violations and damages (including death) referenced herein. These policies, practices, and customs are pled individually and alternatively. The County and Turn Key Health knew, when the County incarcerated the decedent, that their personnel, policies, practices, and customs were such that they could or would

not meet constitutional obligations to protect the decedent, including but not necessarily limited to through provision of medical care. Further, consistent action and inaction by the County and/or Turn Key Health employees or agents, specifically with regard to the decedent, confirms policies, practices, and customs alleged in this complaint. The County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, or through such widespread practice and custom that such practice and custom became the policy of the County as it related to its jail. Turn Key Health likewise made decisions about policy and practice which it implemented through appropriate employees, decisionmakers, or policymakers, and in the alternative or in addition through partnership or joint action with the County. Regardless, the Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the identity of chief policymakers at the pleading stage.

53.     There were several policies, practices, and customs of the County and Turn Key Health which were moving forces behind, caused, were producing causes of, or proximately caused the decedent's suffering and death, and other damages referenced in this pleading. The County and Turn Key Health made deliberate decisions, acting in a deliberately indifferent (applied only to episodic acts, if any, but not to alleged conditions of confinement) or objectively unreasonable manner, when implementing or allowing such policies, practices, and customs to exist. Further, when the County and Turn Key Health implemented or consciously allowed such policies, practices, and customs to exist, they knew with certainty that the result would be serious injury or illness, suffering, or death.

### 2.     Turn Key Health's Agreement and Partnership with Smith County

54.     The business of providing, or in some situations unfortunately not providing, healthcare and mental health care to prisoners in county jails throughout the United States is big business. There are untold millions of dollars to be made by private companies, such as Turn Key

Health, promising and contracting to provide such services. Turn Key Health is no exception to the rule that such companies are in business to make significant profits.

55.     A July 31, 2024 article regarding Turn Key Health addressed widespread systemic issues with Turn Key's provision of medical and mental health care to jail detainees. Turn Key Health is one of the fastest growing for-profit companies promising county jails to save costs incurred in treating medically and mentally ill people in jails. However, during the past 10 years, at least 50 people under Turn Key's care died. In dozens of cases, Turn Key Health employees did not send people to the hospital when they were in crisis, catatonic, or refusing to eat or drink. The company staffed mental health and other medical positions with low-level nursing assistants who were trained to perform basic tasks, such as taking vital signs, but who could not diagnose or assess medical conditions. Physicians and advanced-level nurses would consult over the phone for just a limited number of hours per week instead of actually making in-person visits. Further, until 2023, Turn Key Health would often restrict the type of medication it would provide to people in jail, such as not giving detainees needed long-acting psychiatric drugs and prescriptions that they had received before being arrested. Dr. William Cooper is Turn Key Health's medical director. The reporters, in order to examine and determine Turn Key's practices, obtained records including internal documents and emails between Turn Key leaders and public officials, in nearly 70 counties across Texas, Oklahoma, Arkansas, Louisiana, Colorado, Kansas, and Montana. They also reviewed over 100 lawsuits regarding jail deaths and injuries. The reporters determined that Turn Key has staffed jails with mostly licensed practical nurses or medical assistants. Such employees can be licensed within a year or less of education and are trained to perform simple tasks like checking a person's pulse. They are not trained and or licensed to assess medical conditions.

56.     Turn Key expanded into a multimillion dollar company with contracts to provide medical care in more than seventy-five jails, and for 23,000 people, in ten states. Initially, it operated in smaller counties. However, it then landed contracts for the Tulsa, Oklahoma jail and the troubled county jail in Oklahoma City. After obtaining the Tulsa contract, Turn Key boasted to potential clients that it reduced emergency transfers in Tulsa by 77% and the number of days detainees spent in hospitals by 35%, all within just a few months. Turn Key has cultivated close relationships with law enforcement personnel. It touts cost savings to market its services. Turn Key raffled off hunting gear, including crossbows and knives to sheriffs and deputies at conferences in Texas, Arkansas, Kansas, and Colorado, and it treated clients to steak dinners and delivered packages of smoked bacon for Christmas. Turn Key was so profitable that private equity firms began to take an interest in its cost savings and profits, with Gladstone Capital Corporation investing $11 million in 2021 through secured loans, and Dallas-based private equity group Trive Capital acquiring a majority stake by 2019. Turn Key grew exponentially, indicating that its revenue grew an average of 87% per year between 2014 and 2019.

57.     As of September 2024, when Oklahoma County, Oklahoma was re-evaluating its contract with Turn Key Health, Austin Young, general counsel for Turn Key Health, wrote in an email in part that if Oklahoma County chose to enter a new contract with Turn Key Health, Turn Key Health "would be proud to continue providing services for its patients." Turn Key Health thus confirmed that it views jail detainees as its patients.

58.     Turn Key Health and Smith County entered a contract entitled "Agreement for Comprehensive Health Services" in late 2020 or early 2021. The contract indicated that it was for healthcare personnel and administration at the Smith County jail. The contract's purpose was for healthcare personnel and administration at the Smith County main jail, Smith County

low/medium facility, and Smith County Juvenile Detention Center. It acknowledged that Smith County is charged by law with the responsibility for obtaining and providing reasonably necessary medical care for inmates and detainees in county facilities, and that Turn Key Health is in the business of providing correctional healthcare services.

59.     The contract provided in part several things. Turn Key Health had to secure professional liability insurance in the minimum amount of $1 million per occurrence. Turn Key Health had to comply with standards set forth by the Texas Department of Health and TCJS, as well as other applicable federal, state, or local standards for correctional institutions and medical care. Turn Key Health was to provide for pharmaceutical management services to assure availability of prescribed medications within a reasonable period of time after such medications were ordered, unless medications were not readily available in the community. Facilitation of timely administration medications would require Turn Key Health to allow use of a detainee's home medications upon verification of such medications by Turn Key Health personnel.

60.     Turn Key Health had to provide a method for the recording of medication administrations by Turn Key Health and/or its personnel on a pre-approved form. The form had to allow documentation of detainees receiving and ingesting prescribed medications. The contract also provided that medication administration and medication documentation training had to be made available to Smith County jail staff, upon request, for times when Turn Key Health personnel were not at a jail to administer medication. In other words, Smith County agreed to allow use of a detainee's home medication upon verification of the medication by Turn Key Health personnel. Thus, medication administration documentation, and assurance of medication administration, was a joint effort by Smith County and Turn Key Health. The contract also provided for attempted cost savings, by Turn Key Health negotiating discounted rates with a

pharmacy. Regardless, Turn Key Health would be responsible to pay costs of all pharmaceutical with the exception of "specified medications" in the contract, and further subject to a maximum liability provision listed in the contract. Thus, both Turn Key Health and Smith County were incentivized to save expenses on medication administration, and as well to limit medications that needed to be administered.

61.      Turn Key Health had to arrange for hospitalization services and specialty care for detainees who, in the opinion of the treating provider and/or the medical director, required treatment beyond what was provided at a jail. The cost for such services would be the responsibility of Smith County. However, nothing in the contract would prevent Smith County from transporting detainees that it determined in its discretion required emergent medical treatment.

62.      The contract also provided that Turn Key Health would indemnify and hold Smith County harmless from certain claims and lawsuits related to occurrences arising out of the sole negligence of Turn Key Health. However, immunity from liability and/or indemnity did not extend to Smith County for the actions, omissions, or neglect, or the lack of personnel training, by Smith County. The contract also provided that Turn Key Health would not be responsible for any claims arising from negligence or torts on the part of Smith County. Smith County would also hold harmless Turn Key Health against any loss or damage as a result of the sole negligence of Smith County or Smith County's other vendors.

63.      Turn Key Health was to provide medical unit coverage 24 hours per day, seven days a week, consistent with a matrix in the contract. Turn Key Health contracted to ensure several things, including that it would conduct initial health screenings of detainees, assure adequate staffing levels that would equate to appropriate delivery of care in jails, assure that medications

were administered as prescribed, assure adequate staffing levels to ensure timely sick call triage and follow-up, and assure appropriate and timely response to medical emergencies.

64.     As to written policies and procedures, the contract provided that there would be a written manual of Smith County's and Turn Key Health's apparently joint standardized policies and defined procedures. That manual would be available at all times to Turn Key Health's personnel. The contract provided that Turn Key Health personnel had to be aware that they might, from time to time, be subpoenaed to testify in court or to deposition regarding medical treatment. Turn Key Health was to keep Smith County informed of any and all such requests.

65.     The contract provided that electronic records must be kept for all detainees held beyond their first appearance in court. In any case in which medical care was an issue, or in any criminal or civil litigation where the physical or mental condition of a detainee was at issue, Turn Key Health was to make available to Smith County such records. The contract acknowledged that all medical records prepared or acquired by Turn Key Health were the property of the Smith County Sheriff's Office. Upon termination of the contract, all detainee medical records were to remain in the care and custody of Smith County. The contract also provided monthly reimbursement for services. The initial contract provided that Smith County would pay Turn Key Health $198,375.68 per month. All notices to be provided under the contract, if directed to Smith County, were to be provided to the Smith County Sheriff and Smith County Judge. The contractual relationship between Turn Key Health and Smith County extended beyond the initial contract period, through amendments, up to and through the period of time at issue in this case.

### 3.     Nondelegable Duties and Respondeat Superior

66.     The County owed nondelegable constitutional duties to the decedent. Therefore, the County is liable for the policies, practices, and customs of Turn Key Health, as well as the

actions and inactions of Turn Key Health employees that caused, were proximate causes of, or were producing causes of damages (including suffering and death) referenced in this pleading.

67.     Moreover, Turn Key Health, in addition to liability for its policies, practices, and customs resulting in damages (including death) referenced in this pleading, is also vicariously liable, pursuant to respondeat superior, for the actions or inactions of its employees and agents. Plaintiff makes this allegation pursuant to existing law or as a good faith argument for the extension or confirmation of existing law. Turn Key Health, as a large, private, for-profit entity, does not receive the same protection and is not, in the alternative, analyzed the same way as a liable entity as would be a county or other governmental body. Moreover, as to Turn Key Health employees and agents, due to Turn Key Health's status as a large, for-profit corporation, and controlling Fifth Circuit authority, they are not entitled to claim qualified immunity. No Turn Key Health employees are Defendants in this case, and Plaintiff does not intend to add any natural persons as Defendants. Further, upon information and belief:

- Turn Key Health was systematically organized to perform the major administrative task of providing medical and mental healthcare in jails inside and outside Texas.

- Turn Key Health was at the time of incidents relevant to this case in the business of administering correctional healthcare services.

- Turn Key Health has made millions of dollars each year from its contracts with Texas and other jails.

- Turn Key Health was at the time of decedent's death a systematically organized entity with limited direct supervision by the County, undertaking its task for profit and while in competition with other for-profit firms providing similar services.

- Market forces existed at all relevant times that were likely to provide Turn Key Health with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or nonarduous employee job performance.

- Ordinary marketplace pressures were present at all relevant times regarding Turn Key Health's provision of services to the County.

- Turn Key Health had a multi-year contract, so that its performance was disciplined by pressure from potentially competing firms that could try to take its place in providing services to the County.

- Turn Key Health was required by its contract to purchase substantial insurance coverage to compensate victims of civil rights torts.

- Turn Key Health maintained a risk management and legal defense team ready to aggressively address each claim or lawsuit against it.

- Turn Key Health employed medical professionals who faced potential liability both for choosing a course of treatment that was too aggressive and for choosing a course not aggressive enough, rather than employing jailers who rarely face liability for the adequacy of provided medical care.

- Turn Key Health's primary function at the jail was providing healthcare and mental healthcare services.

- Turn Key Health employees are overseen by Turn Key Health.

- Turn Key Health, as opposed to the County, upon information and belief, took the lead in developing relevant policy regarding healthcare and mental healthcare provision in the the County jail.

- Turn Key Health developed and maintained the County jail's healthcare policies and procedures manual.

- The County could not, upon information and belief, fire or discipline Turn Key Health's employees.

- Turn Key Health employees had discretion to take certain actions which County employees lacked the authority to do.

- Turn Key Health employees did not have a broad range of duties other than providing healthcare and/or mental healthcare.

- Turn Key Health had substantial latitude to ensure that its employees were adequately motivated (such as through employer indemnification, increased benefits, and higher pay).

- Turn Key Health's employees were "at will" employees and could be discharged at any time without cause.

- Turn Key Health determined its employees' wages, conditions of employment, and availability of benefits.

- Turn Key Health marketed its ability, upon information and belief, to attract qualified people to public service as an aspect of its sales pitch to the County and other governmental clients.

- Turn Key Health and its employees knew that they could be subject to liability without the benefit of qualified immunity. Even so, Turn Key Health was able to attract qualified employees.

- Turn Key Health contracted to indemnify the County for liability caused by Turn Key Health or its agents, employees, or contractors.

    4.    <u>Defendants' Policies, Practices, and Customs</u>

68. Plaintiff lists beneath this heading County and Turn Key Health policies, practices, and customs which Plaintiff alleges, upon information and belief, caused, proximately caused, were producing causes of, or were moving forces behind all damages referenced in this pleading, including the decedent's death. Thus, the County and Turn Key Health are liable for all such damages. These policies, practices, and customs worked individually, or in the alternative together, to cause the decedent's death and all other damages asserted in this pleading. Plaintiff pleads conditions of confinement claims arising from policies, practices, and customs. Deliberate indifference is not an element of conditions of confinement claims. In the alternative, Plaintiff pleads episodic act or omission claims arising from policies, practices, and customs. Plaintiff also pleads that relevant actors were both deliberately indifferent and objectively unreasonable, which is relevant to the extent the Court determines that any of Plaintiff's claims are based on episodic acts or omissions.

69. Currently in the Fifth Circuit, courts apply the deliberate indifference standard to episodic acts or omissions claims. Plaintiff asserts that the standard should not be deliberate indifference but instead should be objective unreasonableness based on controlling United States

Supreme Court precedent. Regardless of which standard applies, Plaintiff asks that the court apply the correct law to the facts pled, as required by United States Supreme Court precedent.

70.     Courts have recognized that it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery. Thus, at the pleading stage, a plaintiff is merely required to put a governmental entity or private corporation on fair notice of the grounds for which it is being sued. Federal courts must rely on summary judgment to weed out unmeritorious claims. Plaintiff thus pleads the following policies, practices, and customs, which give rise to conditions of confinement claims, or in the alternative episodic act or omission claims:

**Failing to Provide Emergency or Necessary Medical Care**

- Smith County or Turn Key Health or both failed to provide or delayed providing medical treatment to detainees.

- Smith County or Turn Key Health or both, while knowing that detainees needed immediate emergency mental health care, would continue incarcerating such detainees in lieu of obtaining needed care.

- Smith County or Turn Key Health or both failed to act to address observed serious mental health issues while monitoring detainees. This was in part an effort to save costs.

- Upon information and belief, Smith County or Turn Key Health or both would not respond, or respond appropriately, when detainees suffered from serious medical or mental health issues that may have been visible and apparent through a video feed of a detainee's cell.

- Smith County or Turn Key Health or both would try to save Smith County or Turn Key Health money, by failing or refusing to transport detainees who vitally needed mental health care to an appropriate mental health facility.

- Smith County or Turn Key Health or both allowed the physician who came to the jail to evaluate detainees to simply do focused "office visits" by asking a detainee why the physician is in front of the detainee as opposed to reviewing a detainee's medical and mental health history and addressing a detainee's specific needs with employees and/or contractors at the jail who actually interacted with the detainee.

- Smith County or Turn Key Health or both had a policy or procedure whereby medications for a detainee brought to the jail by family members, friends, or arresting officers could be put into storage with the detainee's general property, such as clothing and other personal items with which the detainee was arrested, thereby affectively "hiding" needed medications instead of assuring that the detainee continued receiving such medications. This and a number of other policies, practices, and/or customs pled in this complaint are bolstered by factual allegations made in a complaint regarding the death of D'Vonte Valentine, in *Yvonne Valentine, individually and as independent administrator of and on behalf of the Estate of D'Vonte Marquese Valentine and D'Vonte Marquese Valentine's heir(s)-at-law and wrongful death beneficiaries v. Smith County, Texas; and Turn Key Health Clinics, LLC;* Civil Action No. 6:24-cv-00331; in the United States District Court for the Eastern District of Texas, Tyler Division.

- Smith County or Turn Key Health or both had in place a custom or practice whereby some newly-admitted detainees in a jail were not medically screened for several days.

- Smith County or Turn Key Health or both had, upon information and belief, a policy, practice, or custom of failing to address untreated mental illness as a medical emergency.

**Monitoring**

- Smith County or Turn Key Health or both failed to monitor detainees or in the alternative failed to adequately or effectively monitor detainees.

- Smith County or Turn Key Health or both chose not to have employees monitor camera feeds of cells in which detainees were left alone, with ready ligatures, such as phone cords.

- Smith County or Turn Key Health or both did not require continuous observation of detainees on suicide watch or with demonstrated self-harm tendencies and who were allowed, pursuant to the County's policy, practice, and/or custom, to have access to or be in possesion of items which could be used as a ligature, including phone cords. Smith County or Turn Key Health or both either had to continously monitor such persons, who had the tools of their own destruction at their disposal, or in the alternative house such persons in cells in appropriate suicide-prevention clothing, without tie-off points, and without access to other items with which such persons could make ligatures.

- Smith County or Turn Key Health or both chose to place or allow to be placed a rolling phone with a lengthy cord adjacent to cells in which

actively suicidal detainees were held, knowing that the cord could be used as a ligature, and that cells had ready tie-off points in them, and then leave detainees to their own devices while not monitoring detainees during the time they had access to the cord.

**Failure to Control and/or Address Contraband/Appropriate Materials Available to Detainees With Self-Harm Tendencies**

- Smith County chose to use manual locks that could apparently be easily manipulated to be jammed, and further allowed detainees who were actively suicidal to have access to materials with which to jam the locks, knowing that the inability to enter a cell in the event of an emergency could result in serious injury or death.

- Smith County or Turn Key Health or both chose to allow continued use, and the existence of, phones with lengthy cords in portions of the jail in which detainees with mental health issues and self-harm tendencies were incarcerated.

- Smith County chose to specify or allow a cell configuration such that a ready tie-off point for ligatures was directly above a bed and stool, thus facilitating both the ease of a detainee tying off a ligature to the tie-off point and then stepping off of the bed and/or stool to facilitate death by suicide.

**Communication**

- Smith County or Turn Key Health or both failed to have in place procedures to assure that medications which were prescribed to and/or being taken by a detainee prior to incarceration were verified such that there could be continuity of care through ordering and administration to the detainee of such medications.

- Smith County or Turn Key Health or both did not have a policy or procedure in place whereby the emergency contact for a detainee would be contacted regarding any questions related to health care or mental health care, including but not limited to the necessity of taking certain medications.

- Smith County of Turn Key Health or both failed to have in place policies and procedures to assure that internal communications regarding administration of medications occurred, and moreoever that any external communications to verify such medications likewise occurred.

- Smith County or Turn Key Health or both failed to have in place a policy or procedure whereby employees would look at detainee prescription

bottles to determine the identity of a pharmacy and/or physician prescribing such prescriptions to assure prompt verification of prescriptions.

• Smith County or Turn Key Health or both allowed the changing of appointments listed in medical records to being "completed" without a physician's confirmation that the specified task related to the appointment had been completed.

• Smith County or Turn Key Health or both had in place a policy or custom whereby a physician could task an administrative assistant to do something which the administrative assistant, not being an appropriate medical person, could not do, such as taking orders related to securing appropriate medication for a detainee.

• Smith County or Turn Key Health or both failed to have in place a proper procedure or practice whereby medical records for a detainee contained notations sufficient to determine who failed to complete a task, such as verifying medication with an outside vendor or physician.

• Smith County had in place a dual chain of command, whereby it would put jailers in a difficult position of understanding to whom they were accountable. This thus created confusion in the jail.

• Smith County had in place a policy whereby on-the-job jailer training included a manual. However, that manual was filed away at the conclusion of training such that trained jailers would not be able to reference the manual while working in the jail.

**Training**

• Smith County used jailers who did not have permanent jailer licenses, but instead only temporary jailer licenses. This reflected a policy, practice, or custom of failing to train jailers before they interacted with detainees. A temporary jailer license does not require any jail-related education, training, or experience. A person could, for example, be working one day at the person's first and only job, at a fast-food restaurant, and then the next day begin working at a jail in which they are confronted with detainees with serious medical and mental health issues. Plaintiff expects that she may learn through discovery that jailers who came in contact with the decedent  operated under only temporary jailer licenses without any education, training, or experience.

• Smith County wholly failed to train new jailers or booking officers but expected them to learn what they needed to know "on the job."

• Smith County or Turn Key Health or both had a policy manual that lacked

a clear and logical structure, which may have been unclear and/or consistent, and which was not regularly reviewed and updated.

- Smith County or Turn Key Health or both failed to have a clear and appropriate policy in place as to how to communicate new or amended policies to people working in the jail.

**Other Evidence of Policies, Practices, and Customs**

- When a policymaker knows about misconduct and fails to take remedial action, such inaction can support a finding that the policymaker acquiesced in the misconduct representing official policy, practice, or custom. Upon information and belief, Smith County or Turn Key Health or both failed to reprimand or take remedial action against employees or agents as a result of action or inaction related to the decedent's suffering and death, thus confirming that the policies, practices, and customs that led to the decedent's suffering and death were in fact *de facto* policies of Smith County and Turn Key Health.

- Consistent testimony or behavior of jail or Turn Key Health employees can also support a finding of official policy, practice, or custom. Smith County or Turn Key Health or both employees acted consistently in their actions or inaction related to the decedent's suffering and death, thus confirming that the policies, practices, and customs that led to the decedent's suffering and death were in fact *de facto* policies of Smith County and Turn Key Health.

<u>5.     Study of Smith County Jails Confirms Systemic Issues</u>

71.     A study of Smith County jails was conducted by Griffith Moseley Johnson and Associates, Inc (GMJ), a management consulting firm. The report issued September 27, 2022 and demonstrated further systemic issues in Smith County jails. GMJ conducted on-site work in March 2022. County personnel originally postponed the on-site visit two times. The consultant determined that Smith County houses detainees in two separate campuses, the Central Jail located at 206 East Elm Street, and the North Jail, located at 2811 Public Road. The consultant made a number of findings.

72.     Smith County does not have 24/7 detainee classification coverage to meet needs of the jail. The jail also had issues in maintaining full staffing in the booking area. There was no

written curriculum or guidance for training booking officers. All training was "on the job." The consultant wrote, "The current staffing situation makes it impossible to assign officers from the housing units to booking to learn the processes." An officer interested in learning the processes and enhancing his or her eligibility for a booking assignment is expected to "put in some off-duty time." A backlog of people being booked into the jail was evident at the time the consultant was on-site. The consultant recommended that classification officers receive yearly update and refresher training, and that the Smith County jail establish a formal classification training program for new officers assigned to the classification division, including standard operating procedures and a field training manual.

73.     The consultant also found that the intake and admission policy did not provide written guidance on the booking portion of the process. The policy did not address the actual booking step in the process, during which a booking officer would interview a detainee to determine personal and family information, vital statistics, and other important information. The consultant also found that jail policies and procedures manual did not even address the classification process, and there was no written curriculum for training new classification officers. The consultant also found that the classification function in the jail was not adequately equipped, leading to delays in staff performing their responsibilities. The consultant also found that the Smith County jail had not had a stable command staff for the prior nine years. The jail had four different chief deputies and seven different captains in that nine-year period. Those two key positions provided knowledge, experience, and invaluable insight into the jail. This was "monumental to the overall success and stability of the jail division." As a result of such instability in command-level positions, the Smith County jail was more susceptible to non-compliance with jail standards. The lack of defined leadership could also contribute to the high staff turnover.

74.     The consultant also found that recent TCJS inspections revealed a significant number of deficiencies at the jail. A TCJS inspection in March 2022 revealed that detainees were being housed in holding cells for over 48 hours. The same condition was seen during a consultant mock inspection in February 2022. Administrative staff were present at that time and made aware of the issue. Smith County was cited by the TCJS during the March 2022 inspection for failing to properly staff the central jail. That was also a condition noted by consultants during the mock inspection. Other issues of non-compliance were allowing a detention officer to work without a valid license, not offering showers to detainees on suicide watch, and failing to use proper procedures with the restraint chair. The consultant noted that the jail's organizational chart showed two jail compliance officer positions, and the job description for the jail administrator lists jail compliance as one of the responsibilities for that position. "However, when the consulting team requested procedures and documentation on jail compliance reporting, [it] received no reply from jail staff."

75.     The consultant also found that working 12-hour shifts can be taxing to an employee, both mentally and physically, on top of mandatory overtime. Jail staff shared with consultants their frustration of not being compensated with pay for working extra hours and then earning compensatory time but not being able to actually take the time off. Consultants recommended changing the 12-hour shifts to either 10-hour or 8-hour shifts to "help with employee burnout which is contributing to turnover rates." The consultant also determined that at the time of the site visit, the jail was understaffed by 28 to 30 people. Further, the jail staff vacancy rate had increased dramatically over the prior three years. The current trend indicated to the consultant that the vacancy rate would continue to increase. Smith County did not even have a written policy in place for promotion procedures for sergeants. Also, a significant portion of

staff turnover was among employees with 12 months or less on the job.

76.     The consultant also reviewed the jail's written policy manual, "a lengthy document of almost 300 pages." The consultant found that the detention division policies and procedures manual lacks a clear and logical structure. The consultant recommended that Smith County form a working group to overhaul the policy manual and organize policies and procedures into a logical sequence. The consultant also found a lack of clarity and consistency in the process by which policy in the jails developed and amended, and how new or amended policies are communicated to staff. Further, the policies and procedures manual was not regularly reviewed and updated. Also, in some cases, policies appeared to be inconsistent and contradictory. The policy manual did not have a consistent vocabulary, and policies and procedures did not reference the statute or jail standard with which they were intended to comply. The sections of the policy addressing pre-admission screening were not clear as to roles and responsibilities.

77.     The consultant also found that in some cases, newly-admitted detainees were not being medically screened for up to six days. The consultant recommended that the jail change the current health screening practice to better satisfy jail standards and adequately protect detainees and staff from health and safety threats. The consultant also found that the detention training lieutenant and coordinator are not organizationally in the jail chain of command. The chain of command put detention training officers in the difficult position of being accountable to two chains of command and potentially receiving directives from their shift supervisor that countermanded directives from the training coordinator. The consultant also found that the detention training program had a well-organized on-the-job curriculum that covered important topics. However, at the conclusion of training, the training manual was filed away such that jailers would not be able to reference it. The consultant recommended that officers be allowed to keep a

copy of the manual, so that jailers could use it as an ongoing resource.

78.     The consultant also found that the Smith County jail had a large number of inexperienced jail staff members. Twenty-seven percent of all staff were working with temporary jailers' licenses. As noted by the consultant, temporary jailers' licenses are issued by the Texas Commission on Law Enforcement ("TCOLE") for people who have not even attended the TCOLE basic county corrections class. The consultant further noted that temporarily licensed staff may not be experienced in dealing with detainees and or familiar with TCJS requirements regarding county jail operations. "This lack of experience can lead to deficiencies relating to safety, security and sanitation in the jail." The consultant provided a list of thirty-six recommendations, almost all of which would have zero financial impact to the County. For those items that would have had a financial impact, the total financial impact would have been only $323,000.00, $240,000.00 of which would be devoted to a possible bonus program to incentivize jail staff longevity, and $80,000.00 which would be devoted to conducting a staffing analysis to include determination of a relief factor for the Smith County jail.

6.     TCJS Records Showing County Policies, Practices and Customs

79.     TCJS reports regarding other incidents or areas of noncompliance with TCJS standards can show policies, practices, and customs. Since it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies or training procedures before discovery, a plaintiff is not required to allege at the pleading stage the level of detail that would be required to prove his or her claims at trial or in response to a motion for summary judgment. That standard applies equally to TCJS reports regarding which Plaintiff may obtain more information through discovery. Plaintiff is only required to allege enough detail to provide sufficient fair notice of the general nature and

substance of Plaintiff's allegations and further demonstrate that Plaintiff's claims have facial plausibility. TCJS reports and documents regarding County jail inspections further demonstrate the above enumerated and other policies, practices, and customs that, when applied individually or working together, caused, were proximate causes of, producing causes of, or were moving forces behind damages (including death) asserted in this pleading. TCJS reports can show not only specific policies, practices, and customs but also can point to a pervasive carelessness for or deliberate indifference to the needs of detainees.

80.     The TCJS inspected the Smith County jail on November 8, 2013. As a result of that inspection, the TCJS determined that deficiencies existed. The Smith County jail was found to be non-compliant with TCJS minimum standards. As a result, the Smith County jail was included in the short list of non-compliant jails at the TCJS website. Further, Smith County was urged to give areas of non-compliance its serious and immediate consideration. It was also urged to promptly initiate and complete appropriate corrective measures. TCJS warned Smith County that failure to initiate and complete corrective measures after receipt of the notice of non-compliance could result in issuance of a remedial order. The Smith County Judge, Smith County Sheriff, and Jail Administrator for the Smith County jail were all notified of the failure to comply with TCJS minimum standards. Everything mentioned in this paragraph occurred each time the Smith County jail was found to be non-compliant with TCJS minimum standards and which is referenced in this pleading below. Specifically, the TCJS found that documentation revealed that Smith County was not completing face-to-face observations of all detainees in this jail at least once each hour as required by TCJS minimum standards. Such observations would be for detainees that had no underlying significant issues, such as self-harm tendencies, or exhibiting bizarre or unusual behavior. TCJS minimum standards do not equal constitutional standards, but

a violation of the TCJS standard could indicate a constitutional violation.

81.     The TCJS inspected the Smith County Jail from December 3-4, 2014. As is true with every TCJS annual jail inspection report, the Smith County Sheriff, Smith County Jail Administrator, and a representative for the Smith County Commissioners Court signed the annual jail report. Among other things, TCJS determined that it had been over a year since the last inspection by a fire marshal for both the main jail and low-risk facilities. A TCJS inspector noted a detainee worker entering the mail control room twice to clean and gather trash. The inspector also determined that the jail was not handling detainee grievances in a timely manner.

82.     The TCJS inspected the Smith County Jail on May 27, 2015. Once again, the Smith County jail was found to be non-compliant with TCJS minimum standards. Smith County continued to have issues making timely and appropriate detainee observations. Documentation indicated that the Smith County jail was not completing visual face-to-face observations of detainees in a holding cell at least once each thirty minutes as required by TCJS minimum standards.

83.     The TCJS inspected the Smith County jail from January 27-29, 2016. When reviewing life safety training documentation, the TCJS inspector noted that several jailers did not receive their first life safety training until after being on duty for two to three weeks. The inspector reminded jail administration that the first life safety training had to be conducted upon employment. Further, before that annual inspection, the jail had been placed in non-compliance after a special inspection showed that a detainee had not been provided his medications as ordered by a physician. The TCJS also inspected the Smith County jail on January 24, 2016. The TCJS found the Smith County jail to be non-compliant with TCJS minimum standards. After reviewing documentation, the TCJS determined that medical staff in the Smith County Jail failed to follow

doctor's orders. A physician prescribed medications for a detainee, and medical staff failed to order all medications and dispense them in a timely manner.

84.     The TCJS inspected the Smith County jail from February 6-8, 2017. When reviewing face-to-face observation records, the inspector found that observations were allegedly being made at certain exact intervals. The inspector recommended that jailers stagger observations, so that detainees would not be able to anticipate when jailers would make observations for safety and security purposes. Upon information and belief, if records indicate that observations were allegedly being made at exact intervals, such would be untrue. Making observations at exact intervals, to the minute, is against human nature. The Smith County jail was also inspected from March 15-16, 2018. The inspector determined that several jailers stationed in direct supervision pods missed quarterly life safety training.

85.     The TCJS inspected the Smith County jail from April 1-3, 2019. Once again, the Smith County jail was found to be non-compliant with TCJS minimum standards. When reviewing detainee recreation logs, the inspector determined that detainees were not offered at least one hour of supervised physical exercise or recreation at least three days per week for the second and third floor detainees in the central jail. A TCJS inspector also found, when reviewing detainee medical paperwork, that jail medical staff were not able to provide documentation for twenty medical personnel having received their TB test/chest x-ray. An inspector also determined that detainees were only provided one uniform, and when the uniform was being laundered, jail staff would remove the uniform from a detainee's cell leaving detainee in his or her underwear. The inspector also determined that the jail was still having issues timely handling grievances.

86.     The TCJS inspected the Smith County jail from May 12-14, 2020. Once again, as had occurred several times previously, the Smith County jail was found to be non-compliant with

TCJS minimum standards. An inspector found during the three days of inspection that detainee workers, who were under supervision of contract food service staff, were using utensils in a manner other than that allowed by the approved menu. Further, an inspector determined that jail staff were not offering one hour of supervised physical exercise or recreation at least three days per week to the second and third floor detainees in the central jail. The inspector also found, when reviewing records related to a complaint, that medication administration records from the last quarter of 2019 were handwritten and had blank days of missing documentation.

87.     The TCJS inspected the Smith County jail from June 21-23, 2021. Once again, as had become far too habitual, the Smith County jail was found to be non-compliant with TCJS minimum standards. The inspector cited the Smith County jail for several issues. The smoke management system failed to operate while under emergency power. Also, when reviewing detainee files, multiple property records were found to be blank and missing required signatures from both the receiving jailer and detainee. The inspector also found that detainees were not provided a change of clothing at least once a week. The inspector found that washable items were not exchanged for replacements at least once each week. When reviewing detainee files, the inspector found that multiple inmate rules acknowledgement forms were blank and missing detainee signatures. Further, as to continuing detainee issues, the inspector found that detainee grievances were not handled in accordance with the approved grievance plan.

88.     The TCJS inspected the Smith County jail on February 18, 2022 and found, once again, Smith County to be non-compliant with minimum jail standards. The inspector noted that Smith County had been provided technical assistance during the June 2021 annual inspection for failing to properly document required quarterly life safety training for jail staff. When the inspector reviewed follow-up documentation, the documentation revealed that Smith County

failed to document life safety training for thirty-four staff members during the second quarter of 2021 and thirty-three staff members during the third quarter of 2021.

89.     The inspector also indicated that Smith County had been provided technical assistance during a June 2021 annual inspection for failing to notify a magistrate within twelve hours, in accordance with the Texas Code of Criminal Procedure, when required by positive responses on a Continuity of Care Query or affirmative answers on the Screening Form for Suicide and Medical/Mental/Developmental Impairments. A continuity of care query and the Screening Form for Suicide and Medical/Mental/Developmental Impairments are tools to be used by a jail to determine which detainees have serious mental health and/or medical issues. The inspector, when reviewing appropriate documentation, determined that the Smith County jail continued to fail to notify a magistrate when warranted by positive responses on those documents.

90.     Further, the inspector noted that Smith County had been provided technical assistance during the June 2021 annual inspection for failing to complete the Suicide Form for Suicide and Medical/Mental/Developmental Impairments in its entirety. Documentation revealed that Smith County had not corrected the issue in its entirety. Missing information still included the date and time a form was completed, questions not being answered, missing notification information, missing CCQ information, and missing signatures.

91.     The TCJS inspected the troubled Smith County jail again on March 3, 2022. Once again, the Smith County jail was found to be non-compliant with TCJS minimum standards. A TCJS minimum standard requires that holding cells for detainees pending intake, processing, release, or other appropriate reasons for temporary holding cannot be used to hold a detainee for more than 48 hours. However, when reviewing a complaint response and documentation, the TCJS inspector identified that on January 25, 2022, detainee Brittany Clegg was placed into a

holding cell upon intake and remained in that cell for approximately 192 hours.

92.     The TCJS inspected the Smith County jail from March 22-24, 2022. The TCJS once again found the Smith County jail to be in non-compliance. The inspector listed six minimum standards violations. When referencing the February 25, 2022 special inspection report, regarding detainees being held in holding cells for more than 48 hours, the Smith County jail still continued with deficiencies related to that standard. The inspector also determined that documented reviews of detainees placed into a violent cell were not being conducted every 24 hours for continuance of status. The inspector also found, when reviewing restraint chair logs, that required maximum 15-minute interval observations were exceeded on multiple occasions. The inspector learned, when reviewing Texas Commission on Law Enforcement records, that a jailer's temporary jailer's license had expired on December 20, 2021. Even so, the jailer continued to work without a valid license from December 2021 until February 9, 2022. The inspector also noted that documentation revealed that Smith County failed to staff the central jail facilities and north jail facility with no less than one jailer per forty-eight detainees, on multiple occasions, from March 1, 2022 to March 31, 2022. Finally, the inspector noted that the Smith County jail violated the minimum standard that each detainee be given the opportunity to take a shower at least every other day or more often if possible. The inspector determined that detainees held in holding cells on suicide watch in the booking area were not given an opportunity to shower at least every other day or more often if possible. The inspector found that multiple detainees were being held in holding cells on suicide watch anywhere from 5 to 10 days without the opportunity to shower even once.

93.     The TCJS inspected the Smith County jail on June 2, 2023. Once again, the Smith County Jail was found to be non-compliant with TCJS minimum standards. When reviewing a

complaint, the inspector determined that a detainee was housed in a cell that did not have a seat. Documentation indicated that the seat had been missing for some time and, as of May 18, 2023, there was no estimated delivery date. An investigation also discovered that a detainee was not offered sufficient recreation opportunities.

94.     The TCJS inspected the Smith County jail on March 4, 2024. Perhaps setting a dubious record for the most times that jail was found to be non-compliant during the TCJS over a several-year period, the TCJS once again found the Smith County jail to be non-compliant with TCJS minimum standards. The TCJS cited the minimum standard which requires jails to provide procedures for distribution of prescriptions in accordance with written instructions from a physician by an appropriate person designated by the sheriff/operator. The inspector indicated that Smith County jail administration had to submit a corrective plan of action, which would include some kind of documented training for medical personnel regarding proper prescription renewal and medication administration. The inspector found, after the custodial death of a detainee, that there was a 10-day period where the detainee did not receive medications as prescribed by a physician. This was verified through a review of medication administration records. Additionally, the TCJS determined through a review of medication administration records that when only one of the detainees prescribed the medications was re-ordered, it was mistakenly re-ordered and distributed at a lower dosage than originally prescribed. It was then not discovered for five months.

### 7.      Suffering and Death of Other Detainees

95.     Other incidents of suffering and death in the County jail can show policies, practices, and customs. Since it is exceedingly rare for a plaintiff to have access to or personal knowledge of specific details regarding the existence or absence of a defendant's internal policies

or training procedures before discovery, a plaintiff is not required to allege at the pleading stage the level of detail that would be required to prove his or her claims at trial or in response to a motion for summary judgment. Discovery can weed out incidents that are not sufficiently related to the incident in this case to show policies, practices, and customs, but at the pleading stage, Plaintiff is only required to allege enough detail to provide sufficient fair notice of the general nature and substance of Plaintiff's allegations and further demonstrate that Plaintiff's claims have facial plausibility. Other incidents of suffering and death further demonstrate the above enumerated and other policies, practices, and customs that, when applied individually or working together, caused, were proximate causes of, producing causes of, or were moving forces behind damages (including death) asserted in this pleading. Other incidents can show not only specific policies, practices, and customs but also can point to a pervasive carelessness for or deliberate indifference to the needs of detainees.

96.     On August 25, 2010, Duantes Harrison died by suicide in the shower area of his cell. He had previously contacted his mother to tell her that he "could not do all this time in prison" and written multiple letters, presumably suicide notes. The report does not specify if Duantes was on any kind of suicide watch or if he had a history of mental health issues. On January 14, 2012, Sonya Armstrong, who had a history of hepatitis C, congestive heart failure, and drug use, died after experiencing a medical emergency in jail. She began having difficulty breathing and had to be taken to the hospital. Her cause of death was cited as dilated cardiomyopathy. On January 14, 2012, Isachar Guerrero, who had been under medical care since entering the jail in March of the previous year, died due to a heart defect. He began experiencing difficulty breathing before becoming unresponsive and was unable to be revived. An autopsy was not ordered due to his death taking place in a medical facility. On September 26, 2013, Jill Manor

died in the hospital after an unspecified amount of time in their care. She had a history of cirrhosis and newly onset GI bleeding, and her family agreed to place her on a DNR due to her worsening condition. Her cause of death was cited as severe cirrhosis with recent GI bleeding. On October 18, 2013, Kerry Winston was found on his cell floor with a cloth "pushed tightly" in his mouth and a towel wrapped around his neck. He was already cool to the touch by the time jailers found him, and life-saving measures were unsuccessful. His cause of death was ruled to be a suicide. On February 26, 2014, John Hays died by suicide while in the Smith County jail. No details are provided as to how he was found, whether any life-saving measures were attempted, or if John had a history of mental illness.

97.    On November 3, 2014, Robert Rowan was found unresponsive in his cell, prompting a code blue emergency. Jailers and responding EMS personnel were unable to revive Robert and eventually pronounced him deceased. His case of death was due to complications of anomalous origins of both coronary arteries, possibly related to the hypertension he was being treated for while in custody. On December 28, 2015, Travis Granville was found having a medical emergency lying on the floor of the bathroom. He was moved to a bunk until medical personnel arrived and transported him to the hospital, where he was pronounced deceased. His cause of death was attributed to a heart attack, but the report does not state if this was due to a preexisting medical condition. On May 14, 2017, Teddy Parker was booked into the Smith County jail on charges of public intoxication and became combative during the intake process—spitting at jailers and being generally non-compliant. He then became unresponsive and had to be taken to the hospital via ambulance. On May 16th, Teddy passed away as a result of a methamphetamine overdose. On June 12, 2017, Carlos Hernandez, Jr. was found hanging from a ligature in the shower area of his cell. Jailers and EMS personnel responded to the situation, but could not revive

Carlos. The report states that Carlos was under 10-minute observations for suicide prevention, but it is unclear why he was in a cell where a ligature could be formed. On November 21, 2017, Quincy Butler, who had a known history of mental health problems, died by suicide after hanging himself from a ligature on November 8th. He was placed on life support, but eventually succumbed to his injuries. On December 1, 2017, Roemello Lewis underwent an MRI after over a year of incarceration where he exhibited bizarre behavior and poor health. A brain tumor was discovered which could not be treated. Roemello was transferred to hospice, where he died on December 14th at the age of 23.

98.     On March 3, 2018, Thomas Bush died at the hospital after undergoing a lumbar puncture and going into respiratory failure. Thomas had a long history of medical conditions, which he is stated to have been refusing treatment for. His ultimate cause of death was complications of pneumonia as well as liver cirrhosis, HIV, and heart disease. On April 29, 2018, Kenneth Carner died due to complications of a gunshot wound he obtained during his arrest nearly 9 months prior. He had spent about a month in the hospital after the incident, then had frequent visits to the ER during his incarceration until the wound ultimately took his life. On November 24, 2018, Randall Britton was found unresponsive in his cell. The report states that Randall did not exhibit any signs of medical or mental health problems on entry to the jail, but indicates that he may have been under observation every 30-45 minutes. He could not be revived by jailers or medical staff and died of hypertensive cardiovascular disease. On May 16, 2020, Raul Rodriguez died days after being admitted to the hospital to be treated for ketoacidosis. While in the hospital, Raul was diagnosed with Covid-19. His cause of death was determined to be due to Covid-related respiratory failure with diabetes as a contributing factor. On June 20, 2020, Tommy Lindsey was found unresponsive in his cell after being seen lying naked on the floor for over an hour. Neither

jailers nor EMS were able to revive Tommy, and he was pronounced deceased. His cause of death was attributed to cardiomegaly with cerebral atrophy and fecal impaction. On September 18, 2020, John Baker died in hospice care while under custody of the jail. Only days before, he was admitted to the emergency room directly from a dialysis treatment, and stated that he "wanted to go in peace." He refused food and medical treatment until his death.

99.     On June 29, 2021, George Sparks passed away in the hospital after a prolonged medical crisis. He had been to the hospital at least one other time during his month-long incarceration, and ultimately died of a pre-existing medical condition. On December 11, 2021, Kevin Freeman was found in his cell hanging from a makeshift noose. Kevin was housed in the jail's clinic due to a heart condition, so it could be assumed he should have been on a medical watch. He was taken to the hospital where he was pronounced brain dead, and later taken off of life support. On January 20, 2022, Michael Blalock died while in the hospital after experiencing difficulty breathing and declining health months after his arrest. The hospital reported that Michael was experiencing liver failure, a pre-existing condition which the jail presumably knew about. Michael was pronounced deceased after his family removed him from life support. On February 9, 2022, Mark Hood experienced a medical emergency while in the day room area of the jail. Medical staff responded after Mark fell to the ground from the stool he was sitting on and began life-saving measures. Mark was ultimately pronounced deceased due to complications of hypertension and heart disease. On February 18, 2022, Torry Newman was discovered to be not breathing in his cell by a jailer. The jailers called for nurses and called a "Code Blue" over the radio, prompting life-saving measures to be taken. Torry was pronounced deceased by EMS personnel, though his cause of death was still unknown at the time of the report being written. On March 20, 2022, Robert Price died after being transported to the hospital due to showing signs of

lethargy and an altered mental state. Robert had suffered many medical issues during his nearly two-year incarceration at the jail, and ultimately died of kidney and liver failure along with hepatitis C.

100.    D'Vonte Valentine was a pre-trial detainee in the Smith County jail in 2022. D'Vonte had a medical condition which required that he take specific medications. His family brought those medications to the Smith County jail, and Defendants in this case failed to provide to D'Vonte needed medications. D'Vonte ultimately died on or about December 4, 2022 as a result of Defendants' failure to provide medical care at all to D'Vonte.

101.    On December 7, 2022, Joshua Fouse was found unresponsive in his cell by jailers. A "code blue" was initiated and life-saving measures were attempted, but Joshua was eventually pronounced deceased by EMS personnel. He did not have any known history of mental or medical health problems, and his cause of death was unknown at the time of the report being written. On March 23, 2023, Charlie Humphries began experiencing chest pains, which escalated to him falling to the floor and having a seizure in the intake area of the jail. Life-saving measures were attempted as Charlie was transported to the hospital, where he was ultimately pronounced deceased. His cause of death was related to a pre-existing stomach disorder. On December 27, 2023, Susan Taylor fainted in the dayroom and became unresponsive. Life-saving measures were attempted, but Susan was ultimately pronounced deceased. Her cause of death is due to a pulmonary embolism.

III.    Causes of Action

    A.    Remedies for Violation of Constitutional Rights

102.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective *remedy* for civil rights claims brought pursuant to 42 U.S.C. § 1983. Therefore, Plaintiff seeks, for causes of action asserted in

this complaint, all *remedies and damages* available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related or supporting case law. If the decedent had lived, he would have been entitled to bring a 42 U.S.C. § 1983 cause of aaction for violation of the United States Constitution and obtain *remedies and damages* provided by Texas and federal law. Plaintiff incorporates this *remedies* section into all sections in this complaint asserting causes of action.

  **B.**  Cause of Action Against Smith County and Turn Key Health Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

  103.  In the alternative, without waiving any other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendants Smith County and Turn Key Health are liable to Plaintiff, Wrongful Death Beneficiaries, and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating the decedent's constitutional rights including but not necessarily limited to those to receive reasonable medical/mental healthcare, to be protected, and not to be punished as a pretrial detainee. These rights are guaranteed by at least the Fourteenth Amendment to the United States Constitution. Pretrial detainees are entitled to be protected and not to be punished at all, since they have not been convicted of any alleged crime resulting in their incarceration. Regardless, Plaintiff relies on the Court to apply the correct constitutional guarantees to the facts pled as required by United States Supreme Court precedent.

  104.  The County's and Turn Key Health's employees and agents acted or failed to act under color of state law at all relevant times. The County's and Turn Key Health's policies, practices, and customs were moving forces behind and caused, were producing causes of, or were

proximate causes of the decedent's suffering, damages, and death, and all damages suffered by Plaintiff, Wrongful Death Beneficiaries, and Claimant Heirs.

105.    The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate chief policymaker(s) at the pleadings stage. Nevertheless, out of an abundance of caution, the County sheriff was the County's relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the County's jail administrator was the relevant chief policymaker over matters at issue in this case. Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker. Further, out of an abundance of caution, Turn Key Health's relevant chief policymaker over matters at issue in this case was or were its chief operating officer, president, vice president, physician-in-charge, chief nursing officer, site supervisor or administrator, or someone in a similar position.

106.    The County and Turn Key Health were deliberately indifferent regarding policies, practices, and customs developed or used with regard to issues addressed by allegations set forth above, for any facts which are ultimately determined to support episodic act or omission claims, to the extent deliberate indifference is a necessary element or prerequisite to such claims at the time the Court makes that determination. Deliberate indifference is not an element of a conditions of confinement claim. The County and Turn Key Health also acted in an objectively unreasonable manner. Policies, practices, and customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of the decedent's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur. Once again, by including the "deliberate indifference" allegation, Plaintiff is not conceding or alleging that deliberate indifference is a necessary element of a conditions of confinement claim. It is not. The County's and Turn Key Health's relevant policies,

practices, and customs, whether written or not, were also objectively unreasonable as applied to the decedent.

107.    Therefore, the decedent's estate and his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery, through the estate administrator, from the County and Turn Key Health:

- the decedent's conscious physical pain, suffering, and mental anguish;

- the decedent's loss of life and/or loss of enjoyment of life;

- the decedent's medical expenses; and

- the decedent's funeral expenses.

108.    Stacy Vernier, individually and as estate administrator asserting claims on behalf of Wrongful Death Beneficiaries, also seeks recovery from the County and Turn Key Health for all remedies and damages available to each Wrongful Death Beneficiary individually for claims asserted in this pleading. The County's and Turn Key Health's policies, practices, and customs caused, were proximate or producing causes of, or were moving forces behind and caused the following damages suffered by each such person, for which Ms. Vernier seeks compensation:

- past mental anguish and emotional distress resulting from and caused by the decedent's death;

- future mental anguish and emotional distress resulting from and caused by the decedent's death;

- past loss of companionship and society, as applicable, that each would have received from the decedent;

- future loss of companionship and society, as applicable, that each would have received from the decedent; and

- loss of household services, excluding any monetary payments made by decedent to a Wrongful Death Beneficiary.

Moreover, Plaintiff seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

      C.    <u>Cause of Action Against Turn Key Health for Negligence/Malpractice</u>

109.    In the alternative, without waiving any other causes of action plead herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations factual allegations section(s) above) to the extent they are not inconsistent with cause of action plead here, Defendant Turn Key Health is liable to Plaintiff (in all appropriate capacities), Wrongful Death Beneficiaries, and Claimant Heirs, as a result of negligence and/or medical negligence/malpractice resulting in and/or causing decedent's pain and suffering and/or death. Turn Key Health and its employees and agents were healthcare providers in the Smith County jail, and they owed the decedent a duty of care. Turn Key Health, its employees, and its agents did not meet the required standard of care and breached duties owed, proximately causing injuries and damages referenced in this complaint. Among other things referenced in this complaint, for which Turn Key Health is given fair notice, Turn Key Health failed to secure and administer to the decedent needed mental health medications and further failed to assure that the decedent was housed and/or observed appropriately, considering his actively suicidal state. Turn Key Health is liable for the actions of its employees and agents pursuant to respondeat superior and/or other vicarious liability principles. Plaintiff (in all appropriate capacities) seeks all remedies and damages available under law, including all those referenced in other portions of this pleading, including specifically those listed in the prayer below, to the extent legally available.

IV.    <u>Concluding Allegations and Prayer</u>

      A.    <u>Conditions Precedent</u>

110.    All conditions precedent to assertion of all claims herein have occurred.

### B.     Use of Documents at Trial or Pretrial Proceedings

111.   Plaintiff intends to use in pretrial proceedings and at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

### C.     Jury Demand

112.   Plaintiff demands a jury trial on all issues which may be tried to a jury.

### D.     Prayer

113.   For these reasons, Plaintiff asks that Defendants be cited to appear and answer, and that Plaintiffs, Wrongful Death Beneficiaries, and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

    a)   actual damages and including but not necessarily limited to for:

- the decedent's medical expenses;

- the decedent's funeral expenses;

- past mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- future mental anguish and emotional distress suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- past loss of companionship and/or society, as appropriate, with the decedent suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- future loss of companionship and/or society, as appropriate, with the decedent suffered by each Wrongful Death Beneficiary resulting from and caused by the decedent's death;

- loss of household services, excluding any monetary payments made by decedent to a Wrongful Death Beneficiary;

- the decedent's conscious physical pain, suffering, and mental health anguish; and

- the decedent's loss of life and loss of enjoyment of life;

b) reasonable and necessary attorneys' fees through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

c) court costs and all other recoverable costs;

d) prejudgment and postjudgment interest at the highest allowable rates; and

e) all other relief, legal and equitable, general and special, to which Plaintiff, Wrongful Death Beneficiaries, and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


   /s/ T. Dean Malone
T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:  (214) 670-9989
Telefax:    (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Jennifer Kingaard
Texas State Bar No. 24048593
jennifer.kingaard@gmail.com
Alexandra W. Payne
Texas State Bar No. 24118939
alexandra.payne@deanmalone.com
Jessica Bebawi
Texas State Bar No. 24108867
jessica.bebawi@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:    (214) 670-9989
Telefax:      (214) 670-9904

Attorneys for Plaintiff